# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>   v.<br><br>ALEX LOPEZ LEON,<br><br>               Appellant. | No.  56467-0-II<br><br>ORDER DENYING MOTION<br>FOR RECONSIDERATION<br>AND<br>ORDER AMENDING UNPUBLISHED<br>OPINION IN PART |

Appellant, Alex Lopez Leon, filed a motion for reconsideration of the court's August 1, 2023, unpublished opinion.  The respondent provided a response to the motion.  After consideration, the court denies the motion for reconsideration.  Accordingly, it is

**SO ORDERED**.  Further,

The Court on its own motion amends the unpublished opinion filed on August 1, 2023, amended on August 8, 2023.  The opinion is amended as follows:

On page 7, 2nd paragraph starting with the word "Separate," line 18-19, the word "repeatedly" and the words "and whether Adrian could join them" are removed. This paragraph therefore ends after the word "was."

On pages 26-27, starting on the last line on page 26, the following language, "Lopez Leon still repeatedly texted Johann asking about Adrian, where Adrian was, and whether Adrian could join them" is removed.  The removed language is replaced with, "Lopez Leon still texted Johann asking about Adrian and where Adrian was."

No. 56467-0-II

No other portion of the opinion or the result is amended.  Accordingly, it is

**SO ORDERED**.

**PANEL**:  Jj. GLASGOW, LEE, PRICE

PRICE, J.

We concur:

GLASGOW, CJ

LEE, J.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56467-0-II |
| Respondent, | ORDER AMENDING OPINION |
| v. | TO CORRECT SCRIVENER'S |
| | ERROR |
| ALEX LOPEZ LEON, | |
| Appellant. | |

The unpublished opinion in this matter was filed on August 1, 2023. After review, the court amends the opinion as follows:

Page 1, line 4, the word "fragrantly" is withdrawn and replaced with the word "flagrantly";

and

Page 31, line 4, the word "fragrantly" is withdrawn and replaced with the word "flagrantly".

IT IS SO ORDERED.

**PANEL**: Jj. GLASGOW, LEE, PRICE

PRICE, J.

GLASGOW, C.J.

LEE, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  56467-0-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ALEX LOPEZ LEON, | |
| Appellant. | |

PRICE, J. — Alex Lopez Leon appeals his convictions for one count of first degree murder and one count of second degree murder, both with firearm sentencing enhancements.  He argues that (1) the State presented insufficient evidence to sustain his convictions, (2) the State committed race-based misconduct by fragrantly or apparently intentionally appealing to jurors' potential racial biases, (3) he received ineffective assistance of counsel, (4) the trial court erred by admitting evidence concerning the demeanor of the victim's mother, (5) the State committed misconduct by making an improper rebuttal argument, (6) the trial court erred in refusing to investigate alleged juror misconduct during deliberations, (7) cumulative error occurred, (8) the trial court erred in failing to consider an exceptional sentence, (9) the judgment and sentence erroneously included discretionary supervision fees, and (10) remand is necessary to correct a scrivener's error in the judgment.  Following oral argument with this court, Lopez Leon filed a supplemental brief to argue

that recent legislative changes require remand to strike the victim penalty assessment (VPA) and to consider whether to waive interest on restitution.[1]

We remand to correct the scrivener's error, to strike the discretionary supervision fees and the VPA, and to consider whether to waive interest on restitution. Otherwise, we affirm.

FACTS

I. MAY 14, 2018, MURDERS AND AFTERMATH

Adrian Valencia Cuevas (Adrian) and Wilberth Lopez Alcala (Wilberth) were murdered on May 14, 2018.[2] Early that morning, law enforcement responded to a 911 call about a double homicide. The driver and front passenger of a white Dodge Charger were dead. The driver was later identified as Wilberth and the passenger was Adrian.

Both men died from gunshot wounds to the head. Shell casings were located inside the car, including one in the area of the front right passenger seat behind Adrian's left shoulder. The fatal shots likely came from a distance of closer than two feet. The medical examiner determined that the bullet that killed Adrian in the front passenger seat entered from the left side of the back of his head before lodging in the right side of his neck, suggesting that the gun was held somewhere in the vicinity of the center rear passenger seat. The bullet that killed the driver, Wilberth, entered from the right side of the head, slightly above the ear, and exited over his left eye. Blood spatter

---

[1] After oral argument, Lopez Leon filed a motion to file a supplemental brief to address recent legislative changes affecting the VPA and interest on restitution. The State filed no response. We grant Lopez Leon's motion and accept his supplemental brief.

[2] Adrian; Wilberth; the codefendant, Javier Valenzuela Felix (Javier); and Adrian's mother, Rosa Valencia Cuevas (Rosa), all have two surnames, some of which are similar. The references to the individuals are inconsistent in the record, and the record does not reflect their naming preferences. We refer to them using their first names to avoid confusion. No disrespect is intended.

was sprayed on the inside of the driver's door, which also suggests that the shot came from the center area of the back seat. The bullet was recovered from Adrian, but the bullet that killed Wilberth could not be located. No guns were found.

Law enforcement obtained multiple surveillance videos from locations near the crime scene. The car was initially captured on video driving into the neighborhood. Minutes later, "a flash" was seen inside the car immediately after it pulled into a driveway. 8 Verbatim Rep. of Proc. (VRP) (Aug. 4, 2021) at 728; Ex. 14-A (0:21-0:36). Shortly thereafter, two people, later identified as Lopez Leon and Javier, climbed out of a passenger window of the car. As Lopez Leon climbed out of the car, he put his hand behind his back in a manner that was later described by the lead detective as consistent with placing a firearm in the back of the waistband or, perhaps, with tucking in his shirt. Later surveillance video showed Lopez Leon's shirt was untucked a few doors down from the car.

Lopez Leon and Javier left the scene together moving quickly. They were then seen walking together four houses from where the car was found before beginning to jog. The time was 4:42 a.m.

Approximately three hours later, Lopez Leon and Javier were seen boarding a bus together, having swapped clothing. Video showed Lopez Leon beckoning Javier to join him as they entered the bus and sat down together. Lopez Leon did not talk to anyone else or attempt to leave Javier, even after Javier fell asleep on the bus. After riding the bus for around 40 minutes, Lopez Leon and Javier exited the bus and walked away together. The time was 8:08 a.m.

In the days following the murders, Lopez Leon searched the internet on his phone with the terms "Sinaloa Cartel Seattle," "Western Washington arrests tied to Mexican drug cartel," "Drug

Bust Connected to Mexican Cartel," and "Mexico captures Sinaloa cartel leader."[3] 9 VRP (Aug. 5, 2021) at 886-87; Ex. 133.

Lopez Leon and Javier also continuously maintained contact during this time period through texting. The texts indicated that Lopez Leon was involved in drug dealing with Javier as numerous texts discussed engaging in drug deals. At one point, Lopez Leon texted Javier, "Honest. As for me like the prisoner says, I don't look, I don't feel, and I don't listen. I just want to make money if possible."[4] 12 VRP (Aug. 30, 2021) at 1390. Lopez Leon also kept Javier apprised of any news about the on-going homicide investigation by text. But some texts were also about more mundane topics, like the food and beer that Lopez Leon happened to be consuming.

Three weeks after the murders, law enforcement arrested Lopez Leon. At the time of his arrest, Lopez Leon had two cell phones. A few days later, Javier was arrested.

---

[3] During the direct examination of one of the investigating detectives at trial, the following testimony about Lopez Leon's internet searches took place without objection:

> Q: And then, were there also searches related to the Sinaloa cartel?
> A: Yes.
> Q: And how do you know that, sir?
> A: There's a search item on May 16th, 2018, at 3:09 a.m. which reads "Sinaloa Cartel Seattle."
> Q: Are there also searches relating to drug busts for Mexican cartels, arrest tied to Mexican drugs, things of that nature?
> A: Yes.

9 VRP (Aug. 5, 2021) at 888-89.

[4] The texts messages were written in Spanish but were later translated into English.

II.  LOPEZ LEON'S POLICE INTERVIEW, PHONE SEARCH, AND CHARGES

After his arrest, Lopez Leon agreed to an interview with law enforcement and consented to searches of his cell phones.

During the interview with the detectives, which was video recorded, Lopez Leon explained that the evening of the murders started with a party in the apartment complex where he lived. Lopez Leon claimed he met Javier, Wilberth, and Adrian for the first time at the party and previously did not have Javier's phone number. Lopez Leon entered Javier's contact information into his phone that night. After a while, the four of them left the party in the white Dodge Charger to shoot a gun in the air for fun. Wilberth drove with Adrian seated in the front passenger seat. Lopez Leon was seated in the right rear passenger seat and Javier was seated in the left rear passenger seat.

As they drove around conversing, Javier began firing the gun in the air, which Lopez Leon captured on video.[5]  Lopez Leon explained he took a video of Javier firing the shots to later show his friends. Minutes later, Lopez Leon recorded another video of only sound, where a gunshot can be heard nine seconds into the recording. He showed law enforcement both videos.

According to Lopez Leon, the gunshot heard in the second video is Javier shooting Adrian. Lopez Leon claimed that he secretly filmed the second video of the gunshot killing Adrian because he suspected something bad was going to happen, stating that "if I know there's something bad going on, I'm, I'm always gonna . . . do something for myself so that I can, you know, be prepared

---

[5] All dialogue on the video was in the Spanish language.

for anything that happens." Clerk's Papers (CP) at 341. But Lopez Leon denied knowing that Adrian was going to be shot.

After Javier killed Adrian, Lopez Leon explained that Javier pointed the gun at him and Wilberth and ordered Wilberth to drive. Shortly thereafter, according to Lopez Leon, Javier, still sitting in the backseat, shot Wilberth as he drove. Lopez Leon physically demonstrated for the detectives how Javier shot Wilberth from the left side of Wilberth's head by reaching around the headrest with the gun held near the driver side's window.

After Wilberth's murder, Lopez Leon explained that he quickly got out of the car and, contrary to the video evidence, attempted to get as far away from Javier as possible. Lopez Leon claimed he walked home and did not immediately tell anyone what happened.

Lopez Leon was asked by the detectives whether Javier ever said he was part of the Sinaloa Cartel. Lopez Leon responded:

> Hmm, not, not like with words saying it, you know, like that specifically. But I know he, I, he mentioned something about working. And when you say work in Spanish, and, I mean, and you're drinking and you have all this coke in your hand, you figure it out pretty much, you know.

CP at 324.

Lopez Leon also told the detectives that he did not understand why Javier did not kill him. He speculated that Javier "probably had something with those particular people [Adrian and Wilberth]," but he could not be certain because he did not "know all their . . . situations." CP at 347.

Lopez Leon also expressed concern about Javier fleeing to Mexico. He explained that he would be "f[*]cked" if Javier fled to Mexico because there was no way he would be able to prove that he did not know Javier beforehand. CP at 312, 327. He said at various times:

> You know, because if he's in Mexico and it's all f[*]cked up, there's no way I'm going to be able to prove that I didn't know him beforehand, you know; so I'm pretty much f[*]cked.

CP at 312.

> Because if you go and if he's in Mexico, I'm f[*]cked. And I'm already f[*]cked anyway.

CP at 327.

> But, but, what I'm scared [of] is that he's probably, what if [he] goes, goes to Mexico and I have to face the music for plates I didn't even break.

CP at 347.

Separate from Lopez Leon's statements in his interview, the search of his phone showed that in the hours before the murders, Lopez Leon repeatedly texted Adrian's brother, Johann, asking where Adrian was and whether Adrian could join them.

Following its investigation, the State charged Lopez Leon with two counts of first degree murder as a principal or as an accomplice for the deaths of Adrian and Wilberth.

The case ultimately proceeded to a lengthy jury trial.

7

III. JAVIER'S GUILTY PLEA

Prior to Lopez Leon's trial, Javier pleaded guilty to two counts of second degree murder while armed with a firearm.[6]  Javier's guilty plea stated in relevant part:

On May 14, 2018 . . . with the intent to cause the deaths of Adrian Valencia Cuevas and Wilberth Lopez A[l]cala, human beings, I did unlawfully cause their deaths when I shot them with a firearm.

CP at 565.

Javier did not testify at Lopez Leon's trial.  The parties agreed to a stipulation to be presented to the jury in Lopez Leon's trial that Javier admitted to being the shooter in the murders of both Adrian and Wilberth.

IV. TRIAL TESTIMONY

The investigating detectives testified at trial consistently with the above facts.  The following additional testimony and argument occurred.

A. DEPUTY MADRIGAL MENDOZA'S TESTIMONY REGARDING CARTELS AND DRUG TRAFFICKING

The State called Deputy Madrigal Mendoza to testify about the text messages between Lopez Leon and Javier.  The deputy began his testimony by explaining his extensive experience with narcotics investigations and the behavior of drug dealers, particularly those connected with cartels and the drug trade from Mexico.  He was a deputy with the Pierce County Sheriff's Office

---

[6] Joshua Dexter, Javier's cellmate, told detectives that Javier admitted to him that the Sinaloa Cartel paid him $20,000 to kill Adrian and Wilberth because they failed to pay money owed to the cartel.  Javier also told Dexter that Lopez Leon was not involved in the murders and that he should have killed Lopez Leon to ensure there were no witnesses.  Javier's alleged statements to Dexter were not presented to the jury.

assigned to the special investigations unit (SIU). The SIU specializes in narcotics operations, vice operations, human trafficking, and fugitive operations.

The deputy's native language is Spanish, his parents immigrated from Mexico, and he frequently uses Spanish in his work. At the time of trial, he had been working for the Pierce County Sheriff's Office for approximately nine years. In explaining his training and experience, the deputy said he went to an undercover school for two weeks where he was trained on how to work in an undercover capacity in narcotics investigations. He also trained in combat and first aid because the SIU unit was involved in serving warrants. He went to informant management school where he was taught how to work with different personalities including different levels of drug users and drug dealers. Furthermore, the deputy went to a narcotics school in California where he learned "how cartels operate[,] specifically from Mexico."[7] 12 VRP (Aug. 30, 2021) at 1358. He learned undercover skills and information about different trades within narcotics operations. The deputy was experienced in many undercover operations; he explained,

---

[7] Separate from the testimony of Deputy Madrigal Mendoza, defense counsel also mentioned cartels during the trial. In opening statements, defense counsel made references to a style of music that glorified cartels, stating:

> So while they're in there, you're going to hear evidence that Adrian plays a song. It's called "corridos." It's a style of music in Mexico that kind of magnifies cartel and drug people. And so that's a style of music in Mexico. . . . And then Javier in the back seat says, what are you doing? That's terrible, says the F-word, everything, that's terrible music, play this other song. Then they -- he plays another song, which is kind of like a rival song -- corridos song where they're talking about kingpins and drug dealers of one group, and then [sic] he liked the other group.

> You're going to hear evidence that in that moment, that exact moment, the face of the guy that was being very generous and saying, oh, everything is cool. . . . All of a sudden that face turns stone cold . . . .

5 VRP (July 26, 2021) at 439-40.

I relied heavy on my training from schools [for these undercover operations]. And I also was mentored by a lot of senior deputies and detectives . . . that coached me, taught me. As well as really debriefing informants that are involved in that particular [Drug Trafficking Organization] or that particular cartel or that particular drug, so that way I don't do something say, something inadvertently that could get me hurt or somebody else hurt.

12 VRP (Aug. 30, 2021) at 1359.

The prosecutor then asked whether there was a hierarchy in the drug industry. The deputy responded:

[A] lot of the drugs and issues that we've been having in the county, particular our area, are coming from Mexico or being delivered across the border. So I would say in the hierarchy of things of narcotic investigations, you have your bosses, your cartel leaders, that are working in Mexico or running cartels that are involved in transporting large quantities of drugs across the border throughout the United States.

. . . .

And when you're dealing with an organization that is capable of getting drugs into the country, it's a very complex organization. I would equate it with a militaristic-type organization where you have a leader and then they have their captains or lieutenants that are in change [sic] of corruption, bribes, distribution, enforcers. Then you have your sergeants that are getting customers or distribution to different hubs.

12 VRP (Aug. 30, 2021) at 1361-62.

The deputy then explained the various ways illegal drugs are transported into Washington:

And the distribution is done in several different ways as well. I mean, you have huge farms where it's actually produced -- huge areas where it's being produced. From there it's packaged and shipped of [sic] to a bordering state where then, there, it's either brought across via trailer via freight where you have people that are bought off or it's going through tunnels. Once it gets across the border, they have stash houses where they house it until they figure out how to get it further into the different hubs of the state. You also have organizations that use public transportation, where a person will get onto a bus carrying a couple of kilos of heroin, meth, [c]oke, and then that person will try to blend in and try to get to, let's say for example, Washington. If you're in Washington, the main hubs are the east

10

side of the state, Yakima, or Wenatchee. The other hub, which is Everett, north King County. Then your third hub, the one that I've seen the most is probably here in Pierce County corridor, Tacoma area.

12 VRP (Aug. 30, 2021) at 1362-63.

The deputy explained the roles individuals play in drug dealing. He said that drug runners are people who obtain drugs from the source to distribute to drug users, and the source is someone that has the larger quantities of drugs. He stated that an ounce of heroin was expensive and that someone dealing in ounces would be considered a higher level source. When asked if a drug runner would necessarily come in contact with all the people above that runner, the deputy said, "[C]artel" bosses were not going to communicate "with a person dealing in balls or teeners or grams or ounces." 12 VRP (Aug. 30, 2021) at 1364. He further explained that trust is critical between sources and their runners:

> Q: Is it possible -- have you experienced this in your past, where the runner, for example, might not -- might have a relationship with his source, but might not come in contact physically face-to-face?
>
> A: Yes. That's done for several reasons. . . . But if you have somebody that has had an established relationship or they've been dealing together for a long time or they have proven themselves, then you may have that person fronting them dope . . . . Because there's a trust there that's been developed. And I would say -- in Hispanic drug dealers which is one of my main focus, that trust is even less. They are a lot more cautious. You say the wrong thing, you ask too many questions, then they're not going to want to do business with you.

12 VRP (Aug. 30, 2021) at 1365-66.

The deputy expanded upon his experience working in narcotics operations. The deputy testified that he had listened to people communicating with each other about drug sales and drug distribution hundreds of times. He had adopted the language of his informants in his undercover operations for his own personal safety. He said, "In my own undercover investigations . . . when

11

I communicate with Hispanic drug sources, I use the very same terminology to purchase drugs in undercover capacity." 12 VRP (Aug. 30, 2021) at 1369.

Next, when the prosecutor asked generally whether drug dealers used a particular phone application to communicate, the deputy responded,

> [I]f we're referring to Hispanic dealers, that's mainly who I focus on, a lot of them use WhatsApp a lot . . . it's encrypted, making it more difficult for law enforcement to be able to get a warrant on the app. So that's what I've seen when it comes to Hispanic drug sources.

12 VRP (Aug. 30, 2021) at 1370.

B. DEPUTY MADRIGAL MENDOZA'S TESTIMONY INTERPRETING TEXT MESSAGES BETWEEN LOPEZ LEON AND JAVIER

Deputy Madrigal Mendoza was then asked, in part relying on his fluency in Spanish, to review the text messages between Lopez Leon and Javier and to provide his opinion about their relationship and drug dealing. The deputy explained the meaning of the term "dark kind" from a text between Lopez Leon and Javier:

> Q: Then is there a text at 6:38:11 p.m., the defendant to Javier, "What's up? Hey, I gave some to that guy. He says the dark kind is really good." Do you see that text, sir?
>
> A. Yes.
>
> Q: Now, when the defendant is talking about a dark kind, what is he talking about?
>
> A. Heroin. In my prior investigations working in undercover capacity or running a heroin investigation, it's really common for Hispanic drug dealers to refer to heroin as "morena." Because in the Spanish language "moreno, morena" refers to brown or dark, which is similar in characteristic -- physical characteristics of heroin because it's also brown and dark.

12 VRP (Aug. 30, 2021) at 1382-83. The prosecutor also asked the deputy what Lopez Leon's reference to "caramel" was in one of his texts to Javier. 12 VRP (Aug. 30, 2021) at 1386. The deputy responded,

> So it's -- it's basically [Lopez Leon] is telling Javier, give me some of your better product, that way they'll continue to come back. They use the term "cajeta" because "cajeta" is like caramel, sweet, we want more of it so it keeps them on the hook.

12 VRP (Aug. 30, 2021) at 1386.

Based on his experience, the deputy said it was possible that Lopez Leon and Javier knew each other long before the day of the murders. Applying his expertise about drug dealers and their operations, he testified that the texts did not appear to be conversations between two strangers because there was "a lot of trust in that relationship." 12 VRP (Aug. 30, 2021) at 1395. He noted that the texts showed that Javier was fronting ounces of heroin to Lopez Leon, meaning providing heroin for sale without expecting immediate payment. The deputy testified that fronting drugs is very uncommon and would require a high level of trust that would normally take months to develop. He also believed there was a lot of trust in the relationship because the ounces of heroin being fronted were "pure" and worth a lot of money.[8] 12 VRP(Aug. 30, 2021) at 1396.

Moreover, Lopez Leon sent Javier photos of food and beer he was consuming, which suggested a level of familiarity that would come with time and trust. It would be a "major red

---

[8] The deputy also suggested that the high value of the drugs being fronted indicated that the drugs came from outside of the area:

> Javier is fronting [Lopez Leon] ounces. That is not -- that's expensive. It's a lot of drugs to be trusted to a person. A lot of the times from what I've seen, any time you have a source that is capable of producing ounces of heroin, more than likely they're from other parts of the state or California.

12 VRP (Aug. 30, 2021) at 1391.

flag" for a drug runner to send food and beer photos to their source if it was a new relationship because it was irrelevant; that type of familiarity took "time and trust." 12 VRP (Aug. 30, 2021) at 1397-98.

The deputy also observed that Lopez Leon initiated most of the text exchanges and was keeping Javier apprised on news about the murder investigations. Lopez Leon assured Javier that the police did not know anything about what happened. VRP at 1389. He said, "I think everything is okay dude. Since they didn't know *us*." 12 VRP (Aug. 30, 2021) 1389 (emphasis added).

The deputy further suggested that it was possible that additional contact between Lopez Leon and Javier could have occurred on a different phone. For example, Lopez Leon texted Javier at one point that he would send him information "on the other phone." 12 VRP (Aug. 30, 2021) at 1394. Deputy Madrigal Mendoza explained that drug dealers have several phones and invest in "burner phones" that they discard every few weeks to avoid law enforcement. VRP at 1369.

When asked if it was common for dealers and sources to meet in person, Deputy Madrigal Mendoza testified that dealers can have a source that they worked with for a long time without ever meeting.

## C. PROSECUTOR'S "MEXICAN DRUGS" COMMENT

Most of the references to Mexico were made by Deputy Madrigal Mendoza in his responses to questions, but at one point in their examination of the deputy, the prosecutor made a reference to "Mexican drugs." 12 VRP (Aug. 30, 2021) at 1371. The prosecutor said, "Now sir, you mentioned a couple of times that your focus, your expertise is related to Mexican drugs. Now do you speak Spanish, sir?" 12 VRP (Aug. 30, 2021) at 1371. The deputy explained that his native language was Spanish. The prosecutor then asked, "Do you use that in your capacity as a deputy

in SIU?" 12 VRP (Aug. 30, 2021) at 1371. The deputy responded that he did use Spanish in his work because he focuses on "Hispanic drug sources and drug informants," so he assists in investigations where the Spanish language is involved. 12 VRP (Aug. 30, 2021) at 1371.

D. TESTIMONY OF LOPEZ LEON'S PSYCHOLOGIST

Lopez Leon called a psychologist to testify about his behavior after the murders. On cross-examination, the State asked the psychologist, "Oh, and by the way, the defendant, did he tell you he was from Sinaloa?"[9] 13 VRP (Sept. 1, 2021) at 1526. Defense counsel objected as to form and relevance. The State contended that it believed the reference to Sinaloa was part of Lopez Leon's personal history that the psychologist obtained from him, but the State withdrew the question.[10]

E. TESTIMONY OF ADRIAN'S MOTHER, ROSA

Also testifying at the trial was Adrian's mother, Rosa. Shortly after the murders, detectives showed Rosa surveillance video of the two individuals leaving the scene. She quickly identified Lopez Leon and Javier. Rosa testified that she was "in shock" because she recognized both of them and Lopez Leon had previously not disclosed his involvement. 10 VRP (Aug. 9, 2021) at 998. In fact, Lopez Leon had previously accompanied her to the crime scene, hugged her, and told her not to worry because he suspected he knew who killed Adrian.

---

[9] The prosecutor also asked one of the detectives whether she later learned whether or not Lopez Leon came from Sinaloa. The detective responded that she did not recall.

[10] The State may have been mistaken about what Lopez Leon told the psychologist. The psychologist's report memorialized the locations Lopez Leon told the psychologist that he lived, namely that he was born in Southern California, moved to the Baja California region of Mexico when he was young, not Sinaloa, and that he lived in Mexico until he was about 14 before moving to Southern California and then to Washington five years later. But the report also noted that "Mr. Leon did not[e] that the co-defendant [Javier] had 'mention[ed] I'm from [the] Sinaloa cartel' and 'he was from over there' . . . ." CP at 181-82.

Rosa also testified about what she knew of Lopez Leon and Adrian's relationship, saying that she had never seen Lopez Leon and Adrian talk to each other before and, to her knowledge, they were not friends. Rosa said she did not have any first-hand knowledge of what happened on the night of the murders after she fell asleep.

The detectives who showed Rosa the video also testified about her emotional reaction. One detective, over defense counsel's objection, was allowed to testify that Rosa began crying and was visibly upset when she recognized Lopez Leon in the video. The other detective also testified that Rosa was "very excited" and "cried" as he played the video for her. 1 VRP (Sept. 7, 2021) at 33-34.

In pretrial motions in limine, defense counsel had sought to exclude all of the testimony about Rosa's demeanor when she saw Lopez Leon in the surveillance video, however the trial court ruled that such testimony would be permitted.

F. BALLISTICS TESTIMONY

Brenda Walsh, the State's ballistics expert, testified about the cartridges and the single bullet found at the scene, including her conclusion that two guns may have been used. Walsh said that all 11 cartridge cases found in the car were 9mm cartridges fired from the same gun. This included the cartridge case located in the vicinity of the front seat.

Walsh also testified that semiautomatic guns typically eject cartridges to the right and slightly to the rear. Because of its placement, Walsh testified that it was possible the 9mm cartridge casing found in the vicinity of the front right passenger seat was ejected from the gun used to kill Wilberth, but she could not be certain without analyzing the actual gun used.

Walsh did not have the bullet that killed Wilberth available for examination. But she did examine the bullet that was recovered from Adrian. She concluded this bullet was possibly from a different gun from the one that left the numerous 9mm cartridges. Based on the bullet's weight, diameter, length of engagement, and lack of damage, she concluded the bullet may have been a .380 auto caliber, not a 9mm. Yet, she could not be certain without testing the actual gun used.

V. CLOSING ARGUMENT AND VERDICT

Following the evidence admitted at trial, the case proceeded to closing arguments. The defense argued its theory that Lopez Leon and Javier did not know each other before the murders. The defense further argued that the only reason Lopez Leon appeared to act in concert with Javier after the murders was because he was scared of Javier. The State countered with its theory that the two had a preexisting relationship and acted together.

The issue of Javier's confession to *both* murders was also raised. Defense counsel argued:

> So when you look at the elements of who caused the deaths, we know it's Javier. We know he did that. But regardless of that, the State wants to believe that that is not truthful. The State accepted his guilty pleas of shooting and killing Adrian and Wilberth, but they don't want to you [sic] accept that. . . .

16 VRP (Sept. 8, 2021) at 1824.[11] Later, defense counsel reiterated this point, stating, "The State knows that Javier did the killing." 16 VRP (Sept. 8, 2021) at 1832. The State objected, but the trial court overruled the objection. Defense counsel buttressed this point by claiming they

---

[11] Javier pleaded guilty two years before Lopez Leon's trial. The ballistics report from Walsh, the State's firearm expert, did not begin until months after Javier pleaded guilty. At oral argument before this court, the State explained that this additional investigation changed the State's theory of the murders by the time of trial. Wash. Court of Appeals oral argument, *State v. Alex Lopez Leon*, No. 56467-0-II (June 20, 2023), at 10 min., 9 sec. through 11 min., 31 sec. (on file with court).

deliberately chose to rarely object during the trial, stating, "We didn't object to anything because it's clear we knew that Javier did the killing." 16 VRP (Sept. 8, 2021) at 1832.

In rebuttal, the prosecutor responded to this argument by trying to reconcile Javier's confession with the State's theory that Lopez Leon participated in the murders. Without objection from defense counsel, the prosecutor on three occasions suggested there may have been "an agreement" between Lopez Leon and Javier whereby Javier would take the fall for the murders if they got caught. 16 VRP (Sept. 8, 2021) at 1880. The prosecutor rooted this suggestion in Lopez Leon's interview statements where he claimed he would be in trouble if Javier fled to Mexico. The prosecutor suggested these statements made no sense—in reality, Lopez Leon would not be in trouble if Javier fled to Mexico, it would actually strengthen Lopez Leon's defense. The prosecutor argued only if there was an agreement that Javier would take the entire blame for the murders would Lopez Leon's concern for Javier leaving the country make any sense.

Following deliberation, the jury found Lopez Leon guilty of first degree murder in the death of Wilberth and the lesser crime of second degree murder in the death of Adrian, both with firearm sentencing enhancements.

VI. POSTTRIAL MOTIONS

Lopez Leon then learned of a potential issue with jury deliberations. Following the verdict, counsel met with jurors in the jury room. The foreperson told counsel that the jury repeatedly watched the video of Lopez Leon's police interview and concluded that Lopez Leon said "we did it," when referring to the shooting, rather than "he did it," as written in the interview transcript. CP at 138. According to the foreperson, "Juror No. 8," formerly a speech pathologist, used her expertise to lead a discussion with the jury that explored whether the video was contrary to the

written transcript of the interview. Juror No. 8's previous profession as a speech-language pathologist was disclosed during jury selection.

Lopez Leon filed a motion for a new trial based on juror misconduct, and the trial court held several hearings on the matter. The trial court initially believed an evidentiary hearing would be necessary, but after reviewing additional briefing from the parties, the trial court reversed itself.

The trial court concluded that there was no juror misconduct because Juror No. 8 merely used her experience as a speech pathologist to evaluate the evidence and that her experience was fully disclosed during jury selection. The trial court noted that the jurors were discussing a properly admitted video exhibit and their thought processes inhered in the verdict. And this could not support the granting of a new trial. The trial court denied the motion for a new trial without permitting the jury members to be further questioned.

VII. SENTENCE AND APPEAL

The case proceeded to sentencing. Lopez Leon requested a low-end sentence, asking that the trial court take his "youthfulness" into account. CP at 164; 20 VRP (Nov. 19, 2021) at 13-15. He also asked the trial court to take his background in Mexico, his struggles, and the support he could provide to his family into consideration, contending that the trial court could impose any sentence it deemed appropriate when all these factors were considered.

The State pointed out in its sentencing memorandum that the trial court had the authority to consider multiple factors to impose an exceptional sentence below the standard range under RCW 9.94A.535. Nonetheless, the State argued that an exceptional sentence based on Lopez Leon's youth was unwarranted and requested a midrange sentence. Neither party discussed the

trial court's authority to impose an exceptional sentence downward by running the sentences for the two convictions concurrently.

The trial court imposed standard range sentences for both convictions, but stated that a low-end sentence was not justified because Lopez Leon's behavior was "deliberate, it was confident, and it was calculated." 20 VRP (Nov. 19, 2021) at 18. The trial court said it did not find a basis for an exceptional sentence due to Lopez Leon's youth, life experiences, and social history.

Additionally, the trial court stated that although the Sentencing Reform Act[12] provided it with some discretion, "[t]he legislature, however, has removed discretion when it comes to . . . the option of running concurrently or consecutively seriously violent offenses that are not the same course of conduct." 20 VRP (Nov. 19, 2021) at 18-19. Given that backdrop, the trial court found that the sentences were required to be served consecutively because they were serious, violent offenses that were not the same criminal conduct. The trial court also stated that sending a man to prison for 44 years was "tragic," yet noted that it looked at a balance between punishment and mitigation. 20 VRP (Nov. 19, 2021) at 20. Furthermore, the trial court observed that Lopez Leon's actions "led us here today." 20 VRP (Nov. 19, 2021) at 20.

In the end, for the second degree murder conviction for the death of Adrian, Lopez Leon's standard range sentence with his offender score was 123 to 220 months, and the trial court imposed a sentence of 147 months plus a 60 month firearm sentencing enhancement. For the first degree murder of Wilberth, Lopez Leon's standard range sentence was 250 to 333 months, and the trial

---

[12] Ch. 9.94A RCW.

court imposed 267 months plus a 60 month firearm sentencing enhancement. The trial court ran the two sentences consecutively for a total of 534 months. The trial court did not explicitly address whether an exceptional sentence was appropriate based on the multiple offense policy resulting in a clearly excessive sentence under RCW 9.94A.535(1)(g).

The trial court said that it waived "all nonmandatory fines and costs" based on indigence. 20 VRP (Nov. 19, 2021) at 19. Yet, the judgment and sentence required Lopez Leon to "pay supervision fees as determined by [Department of Corrections] . . . ." and "community placement fees." CP at 227, 233. The judgment and sentence also stated that the standard range for first degree murder was 123 to 223 months, while the trial court said that the standard range was 123 to 220 months.

Lopez Leon appeals.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Lopez Leon argues that there was insufficient evidence to support his convictions of first and second degree murder because all of the State's evidence was speculative. We disagree.

### A. LEGAL PRINCIPLES

We review challenges to the sufficiency of the evidence by considering whether any rational trier of fact, in viewing the evidence in the light most favorable to the State, could find the essential elements of the crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). An insufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State

and interpreted most strongly against the defendant." *Id.* Circumstantial and direct evidence are equally reliable in determining whether the evidence was sufficient. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). Nonetheless, inferences based on circumstantial evidence must be reasonable and not based on speculation. *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

We review a claim of insufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

To prove first degree murder, the State must prove the defendant caused the death of another person with premeditated intent. RCW 9A.32.030(1)(a). To prove second degree murder, the State must prove the defendant intended to cause the death of another person but without premeditation. RCW 9A.32.050(1)(a).

1. Premeditation

"[T]he premeditation required in order to support a conviction of the crime of murder in the first degree must involve more than a moment in point of time." RCW 9A.32.020(1); *see also* CP at 106. Premeditation is " 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning for a period of time, however short.' " *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)), *cert. denied*, 518 U.S. 1026 (1996).

2. Accomplice Liability

A person is an accomplice of another person in the commission of a crime if:

(a) With knowledge that it will promote or facilitate the commission of the crime, he or she:

(i) Solicits, commands, encourages, or requests such other person to commit it; or

(ii) Aids or agrees to aid such other person in planning or committing it[.]

RCW 9A.08.020(3).

The word "aid" means all assistance whether supplied by words, acts, encouragement, support, or presence. *State v. Dreewes*, 192 Wn.2d 812, 822, 432 P.3d 795 (2019). The State must prove the defendant knew they were promoting or facilitating the principle in the commission of the murder to prove accomplice liability for murder. *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). However, the State may prove the defendant's knowledge through circumstantial evidence. *Id.* The State need not prove that the principle and accomplice share the same mental state. *Dreewes*, 192 Wn.2d at 824-25.

Jurors need not decide the manner of each person's participation provided that they agree that the defendant participated in the crime. *State v. Hoffman*, 116 Wn.2d 51, 104-05, 804 P.2d 577 (1991). For example, in a murder case with two defendants, the jurors are not required to decide which defendant shot the victim. *Id.* at 105.

B. APPLICATION

1. Sufficient Evidence for the First Degree Murder of Wilberth

Lopez Leon argues there was insufficient evidence to support the first degree murder conviction for the death of Wilberth. First, he points to the testimony of Walsh, the ballistics expert, and claims that she never actually testified it was likely or probable that two guns were used in the murders. Lopez Leon next argues that because Javier confessed to murdering both Adrian and Wilberth, the State's theory that Lopez Leon killed either person does not add up. He further argues that any evidence that he had a gun was pure speculation because the video of Lopez Leon's gestures when he climbed out of the car could have been him merely tucking in his shirt.

23

Additionally, Lopez Leon argues that his conduct after the fact, with his texts and interactions about drug dealing, still does not prove that he knew Javier before the murders enough to have reasonably been involved in the murders. Finally, Lopez Leon argues there is no evidence he acted with premeditation in killing Wilberth.

Lopez Leon's arguments are unpersuasive. Viewing the evidence in the light most favorable to the State, there is sufficient evidence showing that Lopez Leon fired the gun that killed Wilberth. With respect to the testimony of the ballistics expert Walsh, it is true that Walsh testified only that it was possible, not likely or probable, that two guns were used in the murders,[13] but Walsh's testimony, combined with the defendant's inconsistent statements and the medical examiner's report, provide sufficient evidence that Lopez Leon fired the gun that killed Wilberth. Walsh testified that the cartridge case located in the vicinity of the front passenger seat was from the same gun that left the numerous other cartridge cases from the shots fired in the air. Walsh further testified that semiautomatic guns typically eject cartridge cases to the right and slightly to the rear; the inference from this testimony supports the positioning of the gun at the time of the fatal shot in the vicinity of the middle of the rear seat.

This positioning of the gun would be consistent with the medical examiner's testimony who concluded that the gunshot that killed Wilberth was fired from right to left. And the inside of the driver's door contained blood spatter providing an inference that the shot came from the right side of Wilberth's head as he sat in the driver's seat.

---

[13] As noted above, Walsh testified that the bullet recovered from Adrian's neck was consistent with a .380 auto caliber based on its weight, diameter, the length of engagement, and lack of damage. Walsh reviewed all cartridge cases that were found in the car and determined they were 9mm cartridges that were fired from the same gun.

And completely inconsistent with this testimony from these experts is Lopez Leon's own detailed description of the shooting he gave to law enforcement during his interview. Lopez Leon claimed that Javier shot Wilberth from the left by reaching around the headrest, even going so far as to physically demonstrate the location of the gun next to the window. The medical examiner, however, explicitly testified that a rear passenger moving his left arm around the headrest and firing was inconsistent with Wilberth's injuries because the bullet entered his head from the right side.

Further, Lopez Leon's actions immediately after the murders support an inference of his direct involvement in the murders. Video surveillance showed Lopez Leon motioning near his waistband after leaving the car. And the lead detective testified that the rear waistband is a common place to conceal a firearm and Lopez Leon's motion in the video surveillance was consistent with placing a firearm there. Although the detective acknowledged that Lopez Leon's motioning in the video could be equally consistent with tucking in a shirt, later surveillance video showed Lopez Leon's shirt was untucked just a few doors down from the car. When all of this evidence and reasonable inferences are construed in favor of the State, a rational trier of fact could determine that Lopez Leon had a gun and used it to kill Wilberth beyond a reasonable doubt.

Still, Lopez Leon argues that there is no evidence that he acted with premeditated intent to kill Wilberth. But considering, as shown above, there is sufficient evidence Lopez Leon shot Wilberth, the overall circumstances create a reasonable inference that this shooting was premeditated. The evidence shows that Wilberth was shot in the head from behind at close range in a car after another person, Adrian, had already been murdered. Evidence of multiple acts of violence and being shot from behind support inferences of premeditation. *Hoffman*, 116 Wn.2d

at 84. Construed in favor of the State, this evidence supports the finding that Lopez Leon deliberately formed an intent to take Wilberth's life. Therefore, sufficient evidence supports the first degree murder conviction as to Wilberth.

2. Sufficient Evidence Shows That Lopez Leon Acted as an Accomplice

Even if the evidence is insufficient to establish Lopez Leon actually pulled the trigger on the gun that shot Wilberth, there was sufficient evidence Lopez Leon acted as an accomplice to Javier in carrying out the murder of Adrian and the premeditated murder of Wilberth, especially given his conduct both before and after the murders.

Lopez Leon argues against this conclusion, contending there is insufficient evidence of accomplice liability. He argues that his decision to start recording a video nine seconds before Javier shot Adrian shows he did not aid or encourage Javier in the murder of Adrian. Lopez Leon also argues that the State failed to prove that he and Javier met or knew each other before the murders. The State responds that Lopez Leon's conduct both before and after the murders provides sufficient evidence of accomplice liability. We agree with the State.

a. Lopez Leon's Conduct Before the Murders

Lopez Leon's conduct before the murders provided circumstantial evidence that he not only knew that Javier had a plan to kill Adrian and Wilberth, but also that he aided Javier in that plan. There was evidence that Lopez Leon lured Adrian to the party by using his friendship with Adrian's brother Johann to get Adrian, a person he had never before met, to the party where Javier was waiting. Even though Lopez Leon told detectives he did not meet Adrian until the night of the party, Lopez Leon still repeatedly texted Johann asking about Adrian, where Adrian was, and

26

whether Adrian could join them. A rational trier of fact could infer that Lopez Leon intentionally lured Adrian to the party to assist Javier in carrying out the murders.

Moreover, Lopez Leon started recording the video of Adrian's murder nine seconds before it happened. Although Lopez Leon claimed in his interview that he started recording because if he knew there was "something bad going on, I'm, I'm always gonna . . . do something for myself so that I can, you know, be prepared for anything that happens," he had no explanation about *how* he knew something bad was about to happen before Adrian was murdered. CP at 341; Ex. 21 at 77. Construed in favor of the State, a rational trier of fact could also conclude that he knew to start recording the video because he was aiding Javier in the murders.

b. Lopez Leon's Conduct After the Fact

Lopez Leon also argues that his conduct after the murders is insufficient to prove that he acted as an accomplice to Javier in the murders. However, we conclude that when viewed in conjunction with Lopez Leon's conduct *before* the murders, his conduct *after* the murders provides further evidence that Lopez Leon acted as Javier's accomplice.

i. Conduct in the Immediate Aftermath of the Murders

Lopez Leon's behavior immediately after the murders suggests that Lopez Leon and Javier had a close relationship. They walked quickly and began jogging side by side as they fled the scene together. In fact, Lopez Leon was still with Javier more than three hours after the murders. Lopez Leon and Javier climbed out of the car shortly before 4:42 a.m., traded clothing with one another, and exited a bus together at 8:08 a.m. Lopez Leon did not attempt to ask for help or escape from Javier while they were on the bus for 40 minutes together, even after Javier fell asleep.

27

ii. Text Messages

Lopez Leon then continued his contact with Javier in the days following the murders. They stayed in constant communication by text message, mostly discussing Lopez Leon's desire to deal drugs for Javier. Lopez Leon and Javier repeatedly discussed meeting to exchange drugs and money. But Lopez Leon also updated Javier on the status of the homicide investigation, assuring Javier that the police did not know anything about what happened. He said, "I think everything is okay dude. Since they didn't know *us*." 12 VRP (Aug. 30, 2021) at 1389 (emphasis added).

Construed in favor of the State, this level of contact shows a preexisting and trusting relationship between the two men. Further reinforcing this conclusion, Deputy Madrigal Mendoza testified that the text messages were not conversations between two strangers because there was "a lot of trust in that relationship." 12 VRP (Aug. 30, 2021) at 1395. The deputy testified that such a high level of trust would take months to develop. He noted that dealers can have a source that they worked with for a long time but never met in person. Moreover, Lopez Leon sent Javier photos of things like food and beer, which suggested a level of familiarity that would only come with time and trust. The texts were continuous, and Lopez Leon initiated most of them.

iii. Lopez Leon's Failure to Explain Why He Wasn't Also Killed

Additionally, Lopez Leon had no explanation for why Javier did not shoot him. And yet, he speculated that Javier spared him because Javier "probably had something with" Adrian and Wilberth. CP at 347; Ex. 21 at 83. A reasonable trier of fact could infer that rather than sparing Lopez Leon, the two were acting in concert.

28

iv. Evidence of Multiple Phones

Moreover, there were other reasons to reject the claim that Lopez Leon and Javier had met for the first time the night of the murders. The evidence showed that Lopez Leon had two phones at the time of his arrest. Following the murders, Lopez Leon told Javier he would send him information "on the other phone." 12 VRP (Aug. 30, 2021) at 1394. Deputy Madrigal Mendoza explained that smart drug dealers have more than one phone and invest in "burner phones" that they replace every few weeks to avoid being intercepted by law enforcement. 12 VRP (Aug. 30, 2021) at 1369. Taken together with the evidence discussed above, a rational trier of fact could have inferred that Lopez Leon previously knew Javier notwithstanding that Javier's contact information was not entered into one of his phones until the night of the murders.

Viewing the evidence in the light most favorable to the State, there was sufficient evidence for a rational trier of fact to reasonably conclude that Lopez Leon was guilty of first and second degree murder in the deaths of Wilberth and Adrian, respectively, either directly or as an accomplice.

## II. RACE-BASED PROSECUTORIAL MISCONDUCT

Lopez Leon argues that the State "flagrantly or apparently intentionally" appealed to racial bias by deliberately introducing evidence of Mexican cartels, drug smuggling, and the purported characteristics of Latinx drug dealers. Lopez Leon accuses the State of improperly appealing to the jurors' potential bias against individuals perceived as Mexican immigrants. While acknowledging the importance of this issue, we disagree.

A. LEGAL PRINCIPLES

Allegations of race-based prosecutorial misconduct are deeply concerning because "[i]f justice is not equal for all, it is not justice." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011). We apply a separate test when allegations of prosecutorial misconduct implicate racial bias because such bias in the justice system undermines the principle of equal justice and is repugnant to the concept of an impartial trial. *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022). It is particularly damaging to these constitutional principles when the prosecutor, as a representative of the State, introduces racial discrimination or bias into the jury system. *Id.* at 710. A prosecutor has a duty to ensure that a defendant's constitutional rights to a fair trial are not violated. *Id.* When a prosecutor resorts to racist argument and appeals to racial stereotypes or racial bias to achieve convictions, a prosecutor gravely violates a defendant's right to an impartial jury. *Monday*, 171 Wn.2d at 676. Allowing racial bias to infringe upon the jury system at any state of a criminal proceeding damages the jury's role as a pivotal check against wrongful State action. *Zamora,* 199 Wn.2d at 711.

We reverse a defendant's conviction when a prosecutor " 'flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence . . . .' " *Id.* at 709, 715, 721 (quoting *Monday*, 171 Wn.2d at 680). Defense counsel's failure to object is irrelevant to claims of race-based prosecutorial misconduct because a defendant's right to a fair trial cannot be waived. *Id.* at 717. Once a court has concluded that a prosecutor's conduct flagrantly or apparently intentionally appealed to jurors' racial bias, it cannot be cured and is per se prejudicial. *State v. Bagby*, 200 Wn.2d 777, 803, 522 P.3d 982 (2023)

(lead opinion of Montoya-Lewis, J.); *id.* at 804-805, (Stephens, J., concurring); *Zamora* 199 Wn.2d at 722.

But not all references to race are improper. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 834, 408 P.3d 675 (2018). The issue of whether a prosecutor fragrantly or apparently intentionally appealed to jurors' racial bias is analyzed objectively. *Zamora,* 199 Wn.2d at 716. Thus, we determine whether an objective observer could view the prosecutor's questions and comments as an appeal to jurors' potential prejudice, bias, or stereotypes in a manner that undermined the defendant's credibility or the presumption of innocence. *Id.* at 718.

An "objective observer" is an individual who is aware of the history of race and ethnic discrimination in the United States and aware of implicit, institutional, and unconscious biases, in addition to purposeful discrimination. *Id.* With this objective observer standard, we consider (1) the content and subject of the statements, (2) the frequency of the remarks, (3) the apparent purpose of the statements, and (4) whether the comments were based on evidence or reasonable inferences in the record. *Bagby*, 200 Wn.2d at 793 (citing *Zamora,* 199 Wn.2d at 718-19).

B. APPLICATION

Lopez Leon argues that the State committed race-based misconduct by repeatedly soliciting testimony about Mexican drug cartels and the behaviors of "Hispanic" drug dealers, and by referencing Mexican drugs. Br. of Appellant 54. Lopez Leon argues that there was no proof that these issues were involved in this case.

Lopez Leon specifically points to the testimony of Deputy Madrigal Mendoza as evidence of the State's race-based misconduct. He argues that the only relevance of Deputy Madrigal Mendoza's discussion of cartel operations, their hierarchy, and drug smuggling across the United

31

States-Mexico border was to appeal to jurors' prejudices. He asserts there was no evidence that any of the drugs exchanged between Javier and Lopez Leon were from Mexico and no evidence that either of them worked for a cartel or obtained the drugs through a cartel. Lopez Leon highlights that Deputy Madrigal Mendoza's reference to Tacoma as a hub for "Mexican" narcotics trafficking and his repeated references to purported characteristics of "Hispanic" drug dealers make it especially apparent that his testimony was made to appeal to the potential prejudice of jurors. Br. of Appellant at 54.

But here, an objective analysis of the facts of the case and the challenged testimony under the four factors outlined in *Bagby* show that the prosecutors did not "flagrantly or apparently intentionally" appeal to racial bias.

First, with respect to the content and subject matter, there is no question that the testimony referenced race and ethnicity. Deputy Madrigal Mendoza referenced race and ethnicity on several occasions and stated that trust is a significant issue with "Hispanic drug dealers." 12 VRP (Aug. 30, 2021) at 1365. He also stated that he adopted the street language of his informants to communicate with "Hispanic drug sources" for his own safety. 12 VRP (Aug. 30, 2021) at 1369. He said that "Hispanic drug dealers" were his area of focus and he often went undercover to help law enforcement with investigations based on his background and fluency in Spanish. 12 VRP (Aug. 30, 2021) at 1370. He described the unique cartel hierarchy and their operations in smuggling drugs across the United States southern border with Mexico. The prosecutor also introduced evidence relating to the Sinaloa Drug Cartel and made an explicit reference to "Mexican drugs" when asking whether the deputy spoke Spanish and used it in his work. 12 VRP (Aug. 30, 2021) at 1371.

The second factor from *Bagby* requires analyzing the frequency of the remarks. Here, while not a large percentage of the trial testimony, the references to race and ethnicity, when combined, played a prominent role in the State's theories and, therefore, cannot be characterized as minimal.

But the final two factors from *Bagby* involve an analysis of the "apparent purpose of the statements" and whether the comments were "based on evidence or reasonable inferences." 200 Wn.2d at 793. This is where Lopez Leon's argument fails. The apparent purpose of the testimony was geared toward areas that were highly relevant for the trial. One of the most critical questions for the jury, given the theories of the two sides, was the level of familiarity and connection between Lopez Leon and Javier. While the defense suggested the two men were unfamiliar with one another before the murders, the State argued the two had a preexisting relationship and acted in concert. In the immediate aftermath of the murders, the two maintained continuous contact, largely about drug dealing. Whether their communications were indicative of a new relationship or an older, more trustworthy, relationship was placed directly at issue by the respective theories of the parties.

Deputy Madrigal Mendoza's testimony was relevant to this important question. Prior to explaining his view of the text messages between Lopez Leon and Javier, he described his training and experience in narcotics investigations, including his special expertise in narcotics operations involving drugs that arrive in the United States from Mexico. This testimony was relevant to explain the process that leads to the involvement of drug sources and their runners which, in turn, laid the foundation for his expertise to address the State's theory that Lopez Leon was a lower-level dealer who obtained drugs from Javier.

Deputy Madrigal Mendoza's characterization of the text communications between the two was also relevant to establishing their familiarity. Utilizing, in part, his fluency in Spanish, the deputy testified that Lopez Leon's texts with Javier showed that Javier was fronting Lopez Leon ounces of heroin. Deputy Madrigal Mendoza explained that someone dealing in ounces would be considered a higher level source and fronting drugs was only done when there was trust established over a long period of time. Again, this was directly relevant to the State's theory that the two were acting in concert during the murders.

It is true that in the course of this testimony, Deputy Madrigal Mendoza testified that trust is even less with "Hispanic drug dealers" who, he said, are typically more cautious. 12 VRP (Aug. 30, 2021) at 1365. This response followed a race-neutral question from the prosecutor who was asking about whether drug sources necessarily meet their runners in person. As part of his undercover work, the deputy further testified that these dealers would not want to do business with him if he said the wrong thing. He also noted that a lot of "Hispanic drug dealers" use WhatsApp to communicate because it is encrypted and as a result harder for law enforcement to infiltrate. 12 VRP (Aug. 30, 2021) at 1370.

While the deputy's use of the term "Hispanic drug dealers" might be viewed as stereotyping, it was not invited by a "flagrant and apparently intentional" appeal to racial bias from the State's questioning.[14] Lopez Leon's own words and behavior made at least some testimony about drug cartels relevant. Indeed, the first mention of cartels in the trial came from defense

---

[14] The prosecutor's single reference to "Mexican drugs," was also not a flagrant appeal to the potential racial biases of the jury because the question was a fair rephrasing of Deputy Madrigal Mendoza's extensive testimony about the areas of his expertise, which includes the drug trade from Mexico.

counsel during opening statement when it was implied that music referencing cartels somehow affected Javier.

> [Y]ou're going to hear evidence that Adrian plays a song. It's called "corridos." It's a style of music in Mexico that kind of magnifies cartel and drug people. And so that's a style of music in Mexico. . . . And then Javier in the back seat says, . . . play this other song. Then they -- he plays another song, which is kind of like a rival song -- corridos song where they're talking about kingpins and drug dealers of one group, and then [sic] he liked the other group.
>
> You're going to hear evidence that in that moment, that exact moment, the face of the guy that was being very generous and saying, oh, everything is cool. . . . All of a sudden that face turns stone cold . . . .

5 VRP (July 26, 2021) at 439-40.

And in Lopez Leon's interview with law enforcement, he said that although he had never actually heard Javier say he was part of a cartel, he suspected that he was. *See* CP at 324 ("[W]hen you say work in Spanish, and, I mean, and you're drinking and you have all this coke in your hand, you figure it out pretty much, you know.").[15] Plus, after the murders, Lopez Leon searched the internet for "Sinaloa Cartel Seattle," "Drug Bust Connected to Mexican Cartel," "Western Washington arrests tied to Mexican drug cartel," and "Mexico captures Sinaloa cartel leader."

---

[15] Lopez Leon argues that it was improper for the State to refer, without objection from defense counsel, to an excerpt from Lopez Leon's interview where he speculated that Javier *might* belong to the Sinaloa Cartel. In support of his argument, Lopez Leon refers to the prejudicial nature of gang evidence and his argument on ineffective assistance of counsel. But given the relevance of this evidence as explained above, Lopez Leon cannot show that an objection to his own words, if made, would have been sustained. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004) (a failure to object is not deficient performance when the objection would not have been sustained). Moreover, it may have been a legitimate defense strategy to not object because Lopez Leon's belief may have strengthened his claim that he was afraid of Javier. *See State v. McFarland,* 127 Wn.2d 322, 336, 899 P.2d 1251 (1995) (for a claim of ineffective assistance of counsel, "the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel").

9 VRP (Aug. 5, 2021) at 886; Ex. 133. These actions by Lopez Leon himself at least somewhat placed these topics at issue in the trial.[16]

Still, Lopez Leon likens the prosecutor's conduct here to that of the misconduct of the State in two cases decided by our Supreme Court, *Monday*, 171 Wn.2d 667, and *Zamora*, 199 Wn.2d 698. But neither *Monday* nor *Zamora* support Lopez Leon's position. In *Monday*, the prosecutor injected racial prejudice into the trial by asserting that black witnesses are unreliable, by repeatedly referring to an "antisnitch code" among African Americans to discount the credibility of his own witnesses, and offensively using racial stereotypes when pronouncing the word "police." 171 Wn.2d at 678-79. Here, unlike in *Monday*, the prosecutor's questions were relevant to the State's theory, specifically that Javier and Lopez Leon had a preexisting drug dealing relationship prior to the murders.

In *Zamora*, the prosecutor committed race-based prosecutorial misconduct by intentionally appealing to racial bias by asking potential jurors during jury selection about unlawful immigration, border security, and crimes committed by undocumented immigrants. 199 Wn.2d at 703, 714, 723. The prosecutor also asked the potential jurors if they locked their doors at night and whether they could "make room for the idea . . . . that we've got a big problem and a porous

---

[16] Lopez Leon further argues that the State's two questions to witnesses about Lopez Leon's potential connection to Sinaloa was an improper appeal to ethnic prejudices. It is true that the State asked a detective and the psychologist whether they learned if Lopez Leon came from Sinaloa. The detective did not recall, and the question to the psychologist was withdrawn after an objection. Lopez Leon claims both of these questions were motivated to appeal to bias because he alleges the State knew from the psychologist's report that Lopez Leon was not actually from Sinaloa. But in the context of the entire trial, including that this presumably mistaken connection of Lopez Leon to Sinaloa was never again raised by the State, Lopez Leon does not demonstrate that these two questions were the result of an improper motive.

border, meaning people are just coming across and we don't know who is here, [and] that a lot of people have some fear about that." *Id.* at 706 (internal quotation marks omitted). Our Supreme Court held that these offensive comments constituted race-based prosecutorial misconduct because the case was not even "remotely" related to immigration, borders, or border security. *Id.* at 719.

Like *Zamora*, this case involves comments about our Southern border with Mexico. But that's where the similarities end.[17] Given the extensive text communications between Lopez Leon and Javier immediately after the murders about drug dealing and Lopez Leon's own searches about the cartels, testimony about cartels and drug dealing was directly relevant to the State's theories.[18]

As instructed by our Supreme Court, we must endeavor to eradicate racial bias from the legal system. Lopez Leon raises the possibility that such racial bias infected his trial. However, when all of the evidence is viewed closely with appropriate standards applied, an objective

---

[17] Lopez Leon also relies on the Ninth Circuit's decision in *United States v. Cabrera,* 222 F.3d 590 (9th Cir. 2000). There, in a case involving the sales of drugs in Las Vegas, the Ninth Circuit held that the lead detective's multiple references to both of the defendants' Cuban nationality and Cuban methods for packaging drugs were mostly irrelevant and prejudicial because they were unnecessary given the issues of the trial and they added to the perception that Cuban drug dealing was a citywide problem in Las Vegas. *Id.* at 596.

Unlike in *Cabrera* and as explained above, Deputy Madrigal Mendoza's testimony was relevant to explaining his background and the State's theories about motive and the relationship between Lopez Leon and Javier.

[18] The facts from this case are also far different from *Bagby*, a recent case from our Supreme Court on race-based prosecutorial misconduct. 200 Wn.2d at 780. There, the prosecutor repeatedly used the term "nationality" to distinguish the defendant, a Black man who was a United States citizen, from the other white witnesses. *Id.* at 795-96. The prosecutor also framed several white witnesses as "Good Samaritans" in closing argument while excluding a Black witness from this description despite the fact that he attempted to remove the defendant from a party before the series of events that led to the alleged crime. *Id.* at 781-82, 797-98. Unlike *Bagby*, the ethnicity descriptors used here were relevant to the issues in the case.

observer could not view the prosecutor's questions and comments as a flagrantly or apparently intentionally appeal to potential racial prejudice, bias, or stereotypes in a manner that undermined Lopez Leon's credibility or the presumption of innocence. Therefore, we hold that the State did not commit race-based prosecutorial misconduct.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

With some similarities to his race-based prosecutorial misconduct argument, Lopez Leon argues that he received ineffective assistance of counsel because his defense counsel failed to object to evidence related to cartels and Mexican drugs. We disagree.

### A. LEGAL PRINCIPLES

We review ineffective assistance of counsel claims de novo. *State v. Vazquez*, 198 Wn.2d 239, 249, 494 P.3d 424 (2021). To show ineffective assistance of counsel, the defendant must demonstrate that their attorney's performance was deficient and the deficient performance prejudiced them. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (known as the two-prong *Strickland* test); *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013). Failure to establish either prong is fatal to the claim. *Strickland*, 466 U.S. at 700.

Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011), *cert. denied*, 574 U.S. 860 (2014). Generally, to show that trial counsel was deficient, "the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *State v. McFarland*, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). A failure to object is not generally deficient performance when the objection would not have been sustained. *See In re Pers.*

*Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). We strongly presume that counsel's performance was reasonable. *Grier*, 171 Wn.2d at 33.

To show prejudice, the appellant must demonstrate a reasonable probability that the outcome of the proceeding would have been different if counsel had not performed deficiently. *State v. Johnson*, 12 Wn. App. 2d 201, 210, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893 (2021). When the defendant bases their ineffective assistance of counsel claim on the defense counsel's failure to object, "the defendant must show that the objection would likely have succeeded." *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019).

B. APPLICATION

Lopez Leon claims his counsel's failure to object to the trial testimony about cartels was deficient performance. He argues his counsel was deficient for failing to object because cartel evidence is highly prejudicial. Lopez Leon also claims that defense counsel was deficient for failing to object to his statements in his interview that he thought Javier might belong to the Sinaloa Cartel. Finally, Lopez Leon argues that there was no strategic reason to not object to testimony using the word "cartel." We disagree.

Lopez Leon's arguments fail because he cannot show his counsel's performance was deficient under the first prong of the *Strickland* test because, as shown above, the evidence was relevant and, thus, an objection would not have been sustained.

1. Cartel evidence generally

For Lopez Leon's initial argument about the failure to object to the general references to cartels, these references are relevant. Deputy Madrigal Mendoza's testimony concerning cartels

was limited to laying the foundation for his expertise in drug dealing and narcotics operations. He used this expertise to interpret the text messages between Lopez Leon and Javier which, given the respective theories of the parties, was highly relevant to the issues of the trial. The relevance of this testimony outweighed its prejudice, especially since the deputy did not testify that Lopez Leon was in a cartel or suggest that he was. An objection to Deputy Madrigal Mendoza's testimony would not likely have succeeded because it was proper foundation testimony.

2. Lopez Leon's statements that Javier might have been in Sinaloa Cartel

Similarly unpersuasive is Lopez Leon's argument that counsel was ineffective for failing to object to Lopez Leon's belief that Javier might belong to the Sinaloa Cartel. Here, too, an objection would not have been sustained because the evidence was relevant and, as shown above, its relevance was not outweighed by unfair prejudice. There was evidence that Javier was Lopez Leon's supplier and was fronting him large quantities of drugs. Lopez Leon's texts support the theory that he wanted to continue making money and working with Javier, who he believed was in a cartel. The State's theory was that Lopez Leon knew he had to gain Javier's trust to get involved in dealing large quantities of drugs, making Lopez Leon's belief that Javier may have been part of a cartel probative under ER 404(b) of a possible motive for aiding in the murders.[19]

3. Strategic reasons to not object

Finally, Lopez Leon also fails to show the absence of legitimate strategic reasons for counsel's failure to object. Defense counsel's decision not to object to testimony about Lopez

---

[19] Lopez Leon points to a line of cases involving the prejudicial effect of gang evidence, citing to, among others, *State v. DeLeon*, 185 Wn.2d 478, 374 P.3d 95 (2016), and *State v. Scott*, 151 Wn. App. 520, 213 P.3d 71 (2009). Because, as shown above, the limited evidence of cartels that was admitted was relevant and not unfairly prejudicial, such cases have no application here.

Leon's internet searches for, as characterized during the testimony of one detective, "drug busts for Mexican cartels, arrest tied to Mexican drugs, things of that nature" and "Sinaloa Cartel Seattle" was a reasonable strategic decision because it could have supported the defense's theory that Lopez Leon was scared of Javier. 9 VRP (Aug. 5, 2021) at 886-87. The jury could have reasonably inferred that the web searches demonstrated Lopez Leon's fear instead of showing complicity with Javier.

Moreover, defense counsel had an overall strategy to minimize objections. Counsel said in closing, "We didn't object to anything because it's clear we knew that Javier did the killing." 16 VRP (Sept. 8, 2021) at 1832. Counsel's statement shows that the defense made a calculated decision to not object at trial to the State's evidence of cartels. With defense counsel announcing this overall strategy, coupled with the likelihood that any objection would have been overruled, Lopez Leon cannot establish that his counsel was deficient by failing to object to this evidence.[20] *See Davis*, 152 Wn.2d at 714; *McFarland,* 127 Wn.2d at 336; *Crow*, 8 Wn. App. 2d at 508.

Considering that Lopez Leon has failed to show his counsel was deficient for not objecting to this evidence, we need not consider the second prong of prejudice under the *Strickland* test. Thus, Lopez Leon's ineffective assistance of counsel argument fails.

---

[20] Defense counsel objected to the State's question to Lopez Leon's psychologist about whether Lopez Leon disclosed he was from Sinaloa. Lopez Leon argues this underscores his counsel clearly understood that an association between himself and the Sinaloa Cartel would be harmful. But even if defense counsel understood that an association between Lopez Leon and the Sinaloa Cartel was harmful, this exchange between the prosecutor and the psychologist is irrelevant to whether an objection to the cartel evidence generally would have been sustained.

IV. DEMEANOR EVIDENCE

Lopez Leon argues that the trial court abused its discretion in admitting testimony about Rosa's emotional reaction when she saw Lopez Leon in the surveillance video. We hold that the error, if any, was harmless.

We review evidentiary rulings for an abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021). A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds. *Id.* Trial courts have wide discretion to balance the probative value of evidence against its potentially prejudicial impact. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 671, 230 P.3d 583 (2010). Evidentiary errors which are not of constitutional magnitude require reversal only if the error, with reasonable probability, materially affected the outcome. *State v. Stenson*, 132 Wn.2d 668, 709, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998).

"Relevant evidence" is defined under ER 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 403 limits the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

Here, Lopez Leon argues that Rosa's emotional response to seeing him on the video after the murders served no purpose except to prejudice him. He argues this evidence elicited an emotional response from jurors and suggested Rosa's opinion on his guilt.

Lopez Leon contends that *State v. Johnson,* 152 Wn. App. 924, 219 P.3d 958 (2009), is controlling. In *Johnson,* the State introduced testimony that the defendant's wife attempted to

commit suicide after learning that the defendant sexually molested two children. *Id.* at 928-30. Witnesses testified that the defendant's wife "freaked out" after the victim described the defendant's genitalia—unique information that the wife would know—and said "Oh, my God, it's true." *Id.* at 932-33. We held that these statements were highly prejudicial because they indicated the defendant's own wife believed the allegations. *Id.* at 933-34.

*Johnson* is distinguishable. Here Rosa's emotional reaction cannot reasonably be seen as an opinion on Lopez Leon's guilt like we found in *Johnson*. Rosa had no unique knowledge; she said she did not know what happened that night after falling asleep. Unlike the wife in *Johnson*, nothing about her reaction would suggest to the jury that she had knowledge about Lopez Leon's involvement in the murders. Instead, Rosa's demeanor at seeing Lopez Leon on the video was relevant to assess the credibility of her testimony about Lopez Leon's inconsistent behaviors and statements after the murders.

But even if the trial court erred by admitting evidence of Rosa's reaction, Lopez Leon must still show a reasonable probability that this evidence materially affected the outcome.[21] *Stenson*, 132 Wn.2d at 709. This, he cannot do for at least two reasons. First, the testimony about Rosa's reaction played a very small part of a lengthy trial. Second, the evidence was minimally prejudicial to the critical question of Lopez Leon's responsibility for the murders. Importantly, the jury would

---

[21] Lopez Leon makes no argument that this evidentiary ruling by the trial court was of a constitutional magnitude.

likely *expect* her to be emotional at seeing that Lopez Leon was present at the scene—a fact he fully admitted at trial—regardless of the level of his involvement.[22]

V.  PROSECUTORIAL MISCONDUCT

Separate from his argument about race-based prosecutorial misconduct, Lopez Leon argues that the State committed prosecutorial misconduct during closing rebuttal argument.  We disagree.

A.  LEGAL PRINCIPLES

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the prosecutor's conduct was improper and prejudicial.[23]  *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).  We first evaluate whether the prosecutor's conduct was improper.  *Id.* at 759.  If the prosecutor's conduct was improper, we then determine if the conduct prejudiced the defendant.  *Id.* at 760.  Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict.  *Id.*

If the defendant fails to object to the prosecutor's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill intentioned that [a jury] instruction could not have cured the resulting prejudice."  *Id.* at 760-61.  This requires the defendant to first show that the prosecutor made improper statements, and then must also show " (1) 'no curative instruction would have obviated any prejudicial effect

---

[22] Lopez Leon also argues that his counsel's failure to object to Rosa's testimony as an improper opinion on guilt constituted ineffective assistance of counsel to the extent that this failure waived the issue.  Because the testimony was not improper, defense counsel's failure to object was not ineffective assistance.  *See Davis*, 152 Wn.2d at 714.

[23] As discussed above, race-based prosecutorial misconduct claims are analyzed under a different heightened standard.

on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). In making this determination, we focus on whether the resulting prejudice could have been cured by an instruction to the jury. *Id.* at 762.

Prosecutors have wide latitude to argue reasonable inferences from the evidence in closing argument. *Thorgerson*, 172 Wn.2d at 448. Despite this wide latitude to argue reasonable inferences from the evidence in closing argument, prosecutors may not suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). Yet, it is not misconduct for a prosecutor to argue that the evidence does not support defense's theory of the case. *Id.*

B. APPLICATION

Here, Lopez Leon argues that the State committed prosecutorial misconduct in rebuttal by suggesting that he and Javier had an "agreement" where if they got caught, Javier would "take the fall" for him. Br. of Appellant at 89, 93 (quoting 16 VRP (Sept. 8, 2021) at 1880-81). Lopez Leon argues that because there was no evidence in the record that there was any type of an agreement, the State "fabricated a prior agreement" based on "no evidentiary support whatsoever." Br. of Appellant at 92-93. The State responds that this argument "aimed more at responding to Lopez Leon's closing argument" rather than providing an additional reason to convict but, even if it was improper, Lopez Leon failed to object and it was curable by an instruction. Br. of Resp't at 70.

It is true that there was no direct evidence of an agreement that Javier would take the fall if they were caught. But confronted with the defense's closing argument that Javier had already admitted to both murders, the State referred back to Lopez Leon's law enforcement interview in

which Lopez Leon said he would be "f[*]cked" if Javier returned back to Mexico. CP at 312, 327. Coupling Javier's confession with Lopez Leon's concern about Javier leaving the country, the prosecutor argued an inference—that is, Javier and Lopez Leon may have had an agreement for Javier to take the fall for Lopez Leon if he was arrested. Arguing a reasonable inference from the evidence is not misconduct. *See Thorgerson*, 172 Wn.2d at 448.

However, even if the prosecutor's rebuttal argument was improper, Lopez Leon has not demonstrated that no curative instruction could have obviated any prejudicial effect on the jury. Had counsel objected and requested a curative instruction, the trial court could have instructed the jury to disregard the argument. We presume that the jury follows the trial court's instructions.[24] *State v. Clark*, 187 Wn.2d 641, 654, 389 P.3d 462 (2017). Thus, we hold that Lopez Leon waived this error by failing to object to the prosecutor's comments below.[25]

VI. JUROR MISCONDUCT

Lopez Leon argues that the trial court erred in refusing to hold an evidentiary hearing regarding an allegation of juror misconduct. We disagree.

---

[24] The jury had already been instructed earlier by the trial court that it must disregard any remark, statement, or argument that is unsupported by the evidence.

[25] Lopez Leon also argues that should we be unpersuaded by his prosecutorial misconduct claim, that we should nonetheless reverse because defense counsel's failure to object to the prosecutor's remarks in rebuttal constituted ineffective assistance of counsel. But Lopez Leon cannot show that defense counsel's decision not to object was not a legitimate trial strategy. *See McFarland,* 127 Wn.2d at 336. As noted above, defense counsel admitted in closing that they deliberately chose not to object to anything because Javier was the one who murdered Adrian and Wilberth ("We didn't object to anything because it's clear we knew that Javier did the killing."). 16 VRP (Sept. 8, 2021) at 1832.

We review a trial court's investigation of juror misconduct for abuse of discretion. *Long v. Brusco Tug & Barge, Inc.*, 185 Wn.2d 127, 132, 368 P.3d 478 (2016). Trial courts have broad discretion in deciding whether to hold an evidentiary hearing on a juror misconduct claim. *State v. Berhe*, 193 Wn.2d 647, 661, 444 P.3d 1172 (2019). The secrecy of jury deliberations is pivotal to our jury system. *Id.* at 658. Courts will not consider allegations of jury misconduct that inhere in the verdict. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 568, 397 P.3d 90 (2017). Matters that inhere in the verdict include facts connected to the " 'juror's motive, intent, or belief, or describe[ing] their effect' " on the jury. *Long*, 185 Wn.2d at 131 (quoting *Gardner v. Malone*, 60 Wn.2d 836, 841, 376 P.2d 651 (1962)). Additionally, if facts cannot be rebutted by other testimony without examining the mental processes of jurors then those facts inhere in the verdict as well. *Long*, 185 Wn.2d at 132.

Courts do not consider matters that inhere in the verdict to protect the sanctity of the jury room by "prevent[ing] the jury from divulging what considerations entered into its deliberations or controlled its actions. *Gardner*, 60 Wn.2d at 843 (quoting *Maryland Cas. Co. v. Seattle Elec. Co.*, 75 Wash. 430, 436, 134 P. 1097 (1913)); *see also Long*, 185 Wn.2d at 132. This rule is necessary to prevent the impeachment of verdicts where the issues at hand inhere in the verdict. *See Long*, 185 Wn.2d at 132, 138. The party alleging juror misconduct has the burden of demonstrating misconduct occurred. *State v. Hill*, 19 Wn. App. 2d 333, 341, 495 P.3d 282 (2021), *review denied*, 199 Wn.2d 1011 (2022).

Jurors are permitted to rely on their personal life experience to evaluate the evidence presented at trial during jury deliberations. *Long*, 185 Wn.2d at 135. When a juror inserts personal

47

knowledge and experience that is known to the parties into deliberations, courts have hesitated to find juror misconduct. *See, e.g., Long*, 185 Wn.2d at 135-38.

Here, Lopez Leon argues that the trial court erred in refusing to hold an evidentiary hearing to allow the defense to explore and prove allegations that Juror No. 8 introduced extraneous expert testimony into the jury room. More specifically, he argues that Juror No. 8 evaluated Lopez Leon's lip movement and speech pattern in the video of his police interview. Lopez Leon claims that Juror No. 8's conduct injected highly specialized knowledge constituting extraneous evidence into the jury room during their deliberations. We disagree.

The basic facts appear undisputed. Juror No. 8 drew on her life experience as a former speech pathologist to evaluate video evidence that was available to the entire jury during deliberations. Her background as a speech pathologist was fully disclosed during jury selection.

This is not enough to pierce the sanctity of the jury room. To probe further into these deliberations would potentially open the door to the impeachment of verdicts any time jurors evaluate evidence based on their personal background or experience.[26] *See Long*, 185 Wn.2d at

---

[26] Lopez Leon supports his argument with *State v. Briggs*, 55 Wn. App. 44, 58, 776 P.2d 1347 (1989). In *Briggs,* the defendant was convicted of multiple counts of robbery, attempted robbery, assault, and attempted rape from a series of attacks on five women. *Id*. at 46. The main defense theory was that none of the victims said that their attacker spoke with a stutter, but Briggs had a profound stutter. *Id*.

A juror, who had their own speech impediment, failed to respond to counsel's question asking if any of the jurors had stuttering or speech problems. *Id.* at 47. But during deliberations, the juror explained that Briggs might have been able to commit the crimes without stuttering based on his own personal experience with a speech impediment. *Id.* at 47-49. Division One held that the juror's use of his undisclosed speech impediment in deliberations prejudiced Briggs. *Id.* at 57.

*Briggs* is inapplicable here; Juror No.8 disclosed her experience as a speech pathologist in jury selection.

138. The jury's thought processes inheres in the verdict and may not be investigated. *Id.* at 131; *Gardner*, 60 Wn.2d at 843. We hold that the trial court did not abuse its discretion in deciding not to hold an evidentiary hearing on the juror misconduct claim.

## VII. CUMULATIVE ERROR

Lopez Leon argues that the cumulative error doctrine warrants reversal of his convictions. We disagree.

The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *Emery*, 174 Wn.2d at 766. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *Clark*, 187 Wn.2d at 649. The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 U.S. 1137 (2007). This doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." *Id.*

Lopez Leon has not demonstrated that any error, or combination of errors, denied him a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

## VIII. EXCEPTIONAL SENTENCE

Lopez Leon argues that the trial court erred by failing to recognize its discretion to impose an exceptional sentence. The State argues that there is no basis for resentencing where the trial court found an exceptional sentence was unwarranted. We disagree with Lopez Leon.

The trial court may impose an exceptional sentence under certain circumstances set forth in the Sentencing Reform Act. For example, the trial court may impose a sentence outside the standard range if it concludes that "there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. An exceptional sentence is warranted when certain mitigating circumstances are present. RCW 9.94A.535(1). For example, the trial court may also impose an exceptional sentence if the effect of the multiple offense policy would be clearly excessive. RCW 9.94A.535(1)(g); *see also* RCW 9.94A.589.

RCW 9.94A.589(1)(b) provides that convictions for two or more serious violent offenses "shall be served consecutively to each other." But the trial court has the authority to impose concurrent sentences for serious violent offenses under RCW 9.94A.535(1)(g). *State v. Graham,* 181 Wn.2d 878, 883-87, 337 P.3d 319 (2014) (holding RCW 9.94A.535(1)(g) allows for an exceptional sentence for multiple current serious violent offenses by running the sentences concurrently).

A remand for resentencing is appropriate if (1) the trial court incorrectly believed it lacked discretion to impose a mitigated exceptional sentence and (2) the record shows a possibility that the trial court would have imposed such a sentence. *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 333-34, 166 P.3d 677 (2007).

Here, Lopez Leon argues that resentencing is necessary because the trial court did not recognize its authority to impose concurrent sentences for multiple serious violent offenses. He specifically points to both parties' failure to identify RCW 9.94A.535(1)(g) as an alternative basis for a mitigated sentence and the trial court's statements that the legislature removed discretion of running concurrently or consecutively violent offenses that are not the same course of conduct.

Additionally, Lopez Leon claims that there was a possibility that the trial court would have considered a mitigated sentence after evaluating whether consecutive sentences would be clearly excessive in light of the multiple offense policy.

The State responds that there is no basis for resentencing because the trial court was aware of its discretion to impose an exceptional sentence and chose not to impose one. Nothing in the record, according to the State, shows a possibility that the trial court would have imposed concurrent sentences for Lopez Leon's involvement in the murders of Adrian and Wilberth.

The question, then, is whether (1) the trial court incorrectly believed it lacked discretion to impose a mitigated exceptional sentence and (2) the record shows a possibility that the trial court would have imposed such a sentence. *Mulholland*, 161 Wn.2d at 333-334.

It is clear the trial court understood its discretion to impose an exceptional sentence based on youth. Lopez Leon asked that the trial court take his "youthfulness," background in Mexico, his struggles, and the support he could provide to his family into consideration. 20 VRP (Nov. 19, 2021) at 13-15. He noted that if those factors were taken into consideration then the trial court could impose whatever it deemed was an appropriate sentence. The State also identified in its sentencing memorandum the trial court's statutory basis, RCW 9.94A.535, for a mitigated sentence but argued an exceptional sentence based on Lopez Leon's youth was not warranted and requested a midrange sentence. Additionally, the trial court explicitly acknowledged its authority to impose an exceptional sentence based on youthfulness at the sentencing hearing, but declined to do so.

Neither party, however, overtly advised the trial court of its authority to run the sentences of two violent offenses concurrently instead of consecutively as a form of an exceptional sentence. And here the trial court expressly stated that the legislature removed its discretion to run concurrent sentences for violent offenses. This was incorrect. Courts retain the authority to impose an exceptional sentence by running the sentences concurrently even for seriously violent offenses. *Graham,* 181 Wn.2d at 883-87. Thus, although the trial court was aware of its discretion to impose an exceptional sentence based on Lopez Leon's *youthfulness*, it is apparent from the record that the trial court did not understand its discretion to impose an exceptional sentence for violent offenses by running the sentences concurrently.

The remaining question, then, is whether the record shows a possibility that the trial court would have imposed a concurrent sentence if it recognized that it had the authority to do so. *Mulholland*, 161 Wn.2d at 333-34. In arguing that it does, Lopez Leon relies on our Supreme Court's decision in *State v. McFarland*, 189 Wn.2d 47, 399 P.3d 1106 (2017). In *McFarland*, the trial court mistakenly believed that it did not have discretion to impose an exceptional sentence for firearm-related offenses. *Id.* at 51-59. The trial court said,

> I don't have -- apparently [I] don't have much discretion, here. Given the fact that these charges are going to be stacked one on top of another, I don't think -- I don't think [the] high end is called for, here.

*Id.* at 51 (alterations in original).

In addition, the trial court commented that the standard range sentence would result in the defendant receiving a similar sentence to those convicted of second degree murder. *Id.* at 51, 58-59. The trial court ultimately imposed a low-end sentence in the standard range for each of the firearm-related convictions. *Id.* at 51. The defendant objected, and the Supreme Court reversed,

holding a remand was appropriate because there was a possibility the trial court would have imposed such an exceptional sentence if it had properly understood its discretion. *Id.* at 55. The Supreme Court based its decision on the trial court's discomfort with its lack of discretion and its comment that the defendant's standard range sentence was equivalent to that imposed for second degree murder. *Id.* at 58-59.

Here, no remand is warranted. Unlike *McFarland*, there is no reasonable possibility that the trial court would have imposed an exceptional sentence downward by running the sentences concurrently even if it had understood its discretion to do so. Already aware of its discretion to impose an exceptional sentence based on Lopez Leon's youthfulness, the trial court refused, characterizing Lopez Leon's behavior as "deliberate, it was confident, and it was calculated." 20 VRP (Nov. 19, 2021) at 18. The record is utterly devoid of any hint that the trial court would have made a different decision if it understood there was a separate statutory route to impose a sentence under the standard range. Indeed, that the trial court imposed a sentence above the low-end is a strong indication that the trial court had no desire to impose an exceptional sentence.

Thus, we do not remand for resentencing for this reason.

IX. SUPERVISION FEES

Lopez Leon argues that the judgment and sentence erroneously included discretionary supervision fees and that we should remand to strike these fees from Lopez Leon's judgment and sentence. The State concedes that the case should be remanded to strike the supervision fees.

As of July 2022, community custody supervision fees are no longer authorized by RCW 9.94A.703(2). LAWS OF 2022, ch. 29, § 7. We recently held that the July 2022 amendment to RCW 9.94A.703(2) applies to cases pending on appeal. *State v. Ellis*, __ Wn. App, 2d __,

530 P.3d 1048 (2023). Because Lopez Leon's case was pending appeal when the legislature amended RCW 9.94A.703(2), we remand to the trial court to strike the fees related to community custody supervision from the judgment and sentence.

## X. SCRIVENER'S ERROR

Lopez Leon argues that we should remand to correct a scrivener's error in the judgment and sentence. The State concedes the error and agrees that remand is appropriate.

The judgment and sentence included an incorrect standard range for Lopez Leon's second degree murder conviction. With his offender score, the correct standard range for the second degree murder conviction was 123 to 220 months. RCW 9.94A.510. Although the trial court recited the correct standard range on the record, the judgment and sentence noted his standard range as 123 to *223* months.

This was a scrivener's error. *See* RCW 9.94A.510; *see also* 20 VRP (Nov. 19 2021) at 16. The appropriate remedy to correct this scrivener's error is to remand for correction. *State v. Sullivan,* 3 Wn. App. 2d 376, 381, 415 P.3d 1261 (2018). Accordingly, we remand for this purpose.

## XI. SUPPLEMENTAL BRIEF RE VPA AND INTEREST ON RESTITUTION

In his supplemental brief, Lopez Leon argues that because of recent legislative changes, this court should remand to strike the $500 victim penalty assessment and to consider whether to waive interest on Lopez Leon's restitution. We agree.

Previously, the law imposed a VPA of $500 on any person found convicted of one or more convictions of a felony or gross misdemeanor in the superior court. Former RCW 7.68.035 (2018). But in the 2023 session, the legislature changed the law to prohibit the imposition of the VPA on

indigent defendants. LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). The new law also requires trial courts to waive any VPA imposed *prior to* the effective date of the amendment if the offender is indigent, on the offender's motion. LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(5)(b). This change took effect on July 1, 2023. LAWS OF 2023, ch. 449.

This change applies to Lopez Leon because his case is still on direct appeal. *Ellis*, 530 P.3d 1048, 1057-58 (2023) (the legislature's VPA amendment applied to the defendant because the case was still on direct appeal). Therefore, we remand to strike the $500 VPA from Lopez Leon's judgment and sentence.

Lopez Leon further claims remand is necessary to consider whether to waive interest on restitution in his judgment and sentence. In 2022, the legislature amended the law to provide that the court "may elect not to impose interest on any restitution the court orders," and the court should "inquire into and consider" several factors in making the determination. RCW 10.82.090(2). Like the VPA changes, these amendments apply here. *See Ellis*, 530 P.3d 1048, 1056-57 (2023). Therefore, we also remand for the trial court to address whether to impose interest on the restitution amount under the factors identified in RCW 10.82.090(2).

## CONCLUSION

We remand to correct the scrivener's error, to strike the discretionary supervision fees and the VPA, and to consider whether to waive interest on restitution. Otherwise, we affirm.

No. 56467-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, J.

We concur:

_____
GLASGOW, C.J.

_____
LEE, J.